687 F.2d 20
 Richard UTESCH, Appellee,
v.
ATLAS MOTOR INNS, INC., Flamboyant Investment Company, Ltd.,
Holiday Inns, Inc. and William W. Bond, Atlas
Motor Inns, Inc., Flamboyant Investment
Company, Ltd. and Holiday
Inns, Inc., Appellants.
 Nos. 81-2408, 82-3077.
 United States Court of Appeals,
Third Circuit.
 Argued July 29, 1982.
Decided Aug. 24, 1982.
Rehearing and Rehearing En Banc Denied Sept. 21, 1982.
 
 1
 Frenchmen's Reef Holiday Inn was completed and opened in 1972. On July 22, 1974, Flamboyant leased the Holiday Inn to Atlas Motor Inns, Inc. ("Atlas") to operate the motel. Atlas operated the motel from that time until midnight on December 31, 1978.
 
 
 2
 On October 18, 1977, the U.S. Navy Aircraft Carrier Nimitz arrived at St. Thomas. Plaintiff, Richard Utesch, was among a number of sailors who visited the island. Late in the day, Mr. Utesch met Douglas Steffins and several other shipmates who advised plaintiff that they had rented rooms at the Frenchmen's Reef Holiday Inn Motel. Mr. Utesch accompanied Mr. Steffins and his friends to the motel. Mr. Utesch had been drinking alcoholic beverages during the day and continued to do so at the motel.
 
 
 3
 A short time after their arrival at the motel, Mr. Utesch and Mr. Steffins changed into their swimwear and proceeded to the motel swimming pool. Mr. Utesch and Mr. Steffins testified that they dived into the pool using the diving board. Mr. Utesch testified that on his first dive, he hit the bottom of the pool with his hands. On his second or third dive he felt a blinding flash. Appendix at 42. It was conceded that plaintiff suffered a spinal fracture that resulted in partial quadriplegia. Plaintiff was diagnosed as intoxicated when he reached the St. Thomas Hospital.
 
 
 4
 Plaintiff brought suit against Holiday Inns, Flamboyant, as owner of the motel, Atlas, as operator of the motel, and the architect of the motel. The case against Holiday Inns, Flamboyant and Atlas was tried in May 1981 to a jury; before trial, plaintiff had dismissed his action against the architectural firm, William W. Bond & Associates.
 
 
 5
 Plaintiff's case was predicated largely upon the testimony of two expert witnesses, Dr. Alexander Gabrielsen and Frank D. Fowler. Dr. Gabrielsen testified, among other things, that the pool in question was too shallow for use with a diving board; had improper lighting for diving; had no supervisory lifeguard on duty; had no visual cues to assist a diver; and had water of insufficient clarity to permit diving. Appendix at 157-159. Mr. Fowler testified that the pool was not suitable for use with any diving board. Appendix at 264. Even though the defendants' witnesses testified that the pool and diving board met all design standards in effect at the time of the incident, plaintiff's experts concluded that since they knew of no spinal injury cases occurring in swimming pools which met N.C.A.A./A.A.U. standards for competitive diving pools, the pool should have met the standards for competitive diving pools. Appendix at 170, 195-96.
 
 
 6
 Plaintiff also presented evidence that Holiday Inns had conducted inspections of the Frenchmen's Reef Holiday Inn, operated by Atlas, and that it had issued certain directives regarding swimming pools and diving boards. Evidence was presented that the as-built plans of the swimming pool had been reviewed by Holiday Inns. Appendix at 16.
 
 
 7
 The jury valued plaintiff's injury at $8,000,000, but also found that the plaintiff contributed to his own injury to the extent of 15%. The court then apportioned the verdict among the defendants and reduced the verdict to $6.8 million under the comparative negligence provisions of the Code of the Virgin Islands. Subsequently, the court awarded plaintiff attorney's fees and costs, and all of the defendants moved for judgment notwithstanding the verdict and/or a new trial, which motions were denied by the trial court.
 
 
 8
 On June 11, 1982 defendants, Atlas and Holiday Inns moved this Court for the entry of an Order dismissing this appeal as to them on the ground that they had reached a settlement agreement with appellee Utesch. The motion was granted, and this appeal continued as to appellant Flamboyant.
 
 DISCUSSION
 A. The Appropriate Jury Instruction
 
 9
 The remaining appellant, Flamboyant, was the owner/lessor of the property in question at the time the accident occurred. As such, Flamboyant's liability in this case is governed[2] solely by the standards set forth in The Restatement (Second) of Torts § 359 (1965).[3] Frenchmen's Reef was leased to Atlas by Flamboyant on July 22, 1974, and Flamboyant did not reserve any portion of the leased premises. It was understood between the parties that Frenchmen's Reef would be operated thereafter by Atlas pursuant to the terms of the lease agreement. Appendix at 750-768.
 
 
 10
 Pursuant to section 359, the trial judge should have instructed the jury that for Flamboyant to be liable there must be proof that Flamboyant knew that the pool's construction embodied an unreasonable risk of harm to the plaintiff, or that by the exercise of ordinary care Flamboyant could have discovered the risk at the time of the transfer of the premises to Atlas.
 
 
 11
 The rule as stated in section 359 is an exception to the general rule of non-liability of the lessor for dangerous conditions existing at the time of the lease as stated in section 356 of the Restatement.[4] See Hunziker v. Scheidemantle, 543 F.2d 489, 493 (3d Cir. 1976); Martin v. The Maintenance Co., Inc., 588 F.2d 355 (2d Cir. 1978); I. Roberts v. United States, 514 F.Supp. 712, 716 (D.D.C.1981). The justification for the exception lies in the lessor's responsibility to the public, which he is not free to shift to the lessee in any case where he has reason to expect that the lessee will admit the public before the land is put in reasonably safe condition for their reception. Restatement, § 359, Comment a.
 
 
 12
 The Restatement test in this case is especially appropriate now that Flamboyant, the lessor of the land, is the only remaining defendant. For the plaintiff to prevail against Flamboyant, there must be evidence from which a jury could infer that Flamboyant had actual knowledge that the pool created an unreasonable risk of harm to persons using it. A crucial issue will be whether Flamboyant, by the exercise of ordinary care, could have discovered that the condition of the premises, i.e., depth of the pool in conjunction with the diving board, at the time of the lease involved an unreasonable risk of harm to members of the public using the pool.
 
 
 13
 In making his charge to the jury, the trial judge instructed on two issues in such a way as to potentially confuse the jury in a manner prejudicial to Flamboyant. Specifically, the trial court erred in instructing the jury that violation of the Virgin Islands Building Code, 29 V.I.C. § 291 et seq., raised a presumption of negligence which the jury could find to have been a proximate cause of the accident. Second, the trial judge's charge regarding the Virgin Islands architectural licensing statute was prejudicial to Flamboyant and was harmful error.
 
 
 14
 B. Jury Instruction on Violation of the Code
 
 
 15
 The evidence relevant to the trial court's instructions on the Virgin Islands Building Code was provided by the testimony of Eric Bonelli, Chief of the Building Permits Section of the Department of Public Works of the Virgin Islands. Mr. Bonelli testified that on July 30, 1971, Flamboyant applied for a building permit to build a 300 room Holiday Inn at Frenchmen's Reef. The building permit was approved and issued on December 28, 1971. Appendix at 10-11.
 
 
 16
 A swimming pool plan was submitted with the original application. No further plans were ever submitted to the Department of Public Works. Mr. Bonelli testified that the plan for the pool as it was constructed was never submitted to the Department of Public Works. He further testified that any variation in the plans submitted should have been submitted for approval by the Department of Public Works. Appendix at 17.
 
 
 17
 Mr. Bonelli also testified that the original plans for the swimming pool were not inspected for depth or type of diving board. He stated that inspections were primarily to check electrical and plumbing installations. Appendix at 22. He also testified that the electricity and plumbing would have been checked on the amended plan had it been submitted, and that the depth of the pool and the type or location of the diving board would not have been factors in approving the revised plan. Appendix at 24. Thus, the only possible inference was that even if the Building Code had been fully complied with in this instance there would have been no change in the depth and diving board as it was actually constructed as a result of that compliance.
 
 
 18
 The trial judge instructed the jury that if they believed that any one or more of the defendants by some act or failure to act violated the provisions of a statute or law of the Virgin Islands, then such act was presumed negligence. Appendix at 659. Although the court also charged that if the jury were to find a violation of the code, but did not find by a preponderance of the evidence that the violation contributed as a proximate cause to the injury or damage, then the mere fact of the violation would not necessarily lead to the conclusion that the accident was caused by the violation, this was not enough to cure the defect. Appendix at 660.[5]
 
 
 19
 The court noted in its charge that 29 V.I.C. § 292 states that the purpose of the Building Code is to safeguard life and limb, property, and public welfare.[6] The court further charged that § 293 defines an owner as a person or persons who own or control property or any part of it, including persons having a vested or contingent interest in the property.
 
 
 20
 Flamboyant concedes that section 292 is applicable to it because it was the applicant for the building permit issued on December 28, 1971, authorizing the construction of the Frenchmen's Reef Holiday Inn. It concedes that the owner of the property involved was an appropriate person to apply for and obtain the building permit which was issued. Flamboyant also concedes that the construction of a swimming pool would be a structure within the meaning of the Building Code. Appellant's Brief at 11. However, Flamboyant does not concede that there are any rules or regulations or a local code dealing with the construction of swimming pools.
 
 
 21
 The court gave an extensive charge on 29 V.I.C. § 294, which requires a permit issued by the Commissioner of Public Works for the construction, reconstruction, or structural alteration, etc., of any structure.[7] In accordance with section 294, Flamboyant submitted its application for a permit, which included plans as required by subsection (e) of the statute, and the plans showed the architect to be William Bond & Associates. However, Mr. Vincent A. Degutis, who was at the time an employee of Bond, was the actual architect. Flamboyant concedes that the Virgin Islands' rules and regulations would require the submission of altered plans to the Department of Public Works. Appellant's brief at 12. Flamboyant thus acknowledges that it may have been guilty of a technical violation of § 294(d)(5) and § 294(e)(13). It does not concede that that violation was a proximate cause of the accident.
 
 
 22
 The trial court commented in its charge on the aforementioned testimony of Mr. Bonelli that he would not have checked the depth of the pool, the diving board, or its location. The court continued:
 
 
 23
 However, I charge you that if the law required that it be checked and Mr. Bonelli's department failed to check it, and if there was a violation, it would nonetheless be a violation even though it had not been checked by Mr. Bonelli.
 
 
 24
 Appendix at 662. It is clear that this entire charge was prejudicial to Flamboyant.
 
 
 25
 Flamboyant argues correctly that it cannot be held accountable for the conduct of the Department of Public Works of the Virgin Islands. Although a technical violation of the code may have been committed by Flamboyant, the only evidence regarding its relationship to the accident was that the Department of Public Works would not have checked the swimming pool plans with respect to those characteristics (depth, diving board) which plaintiff claims were defective. The trial court correctly instructed the jury that there must be a legal or proximate cause between the statutory violation and the accident in question. See Restatement (Second) of Torts § 433(b) (1965). However, in its charge to the jury concerning Mr. Bonelli's testimony, the court implied that Mr. Bonelli and his inspectors would have done something upon receipt of the revised plans for the pool which could have prevented the accident. That charge constituted reversible error: there was no evidence whatsoever that Flamboyant's violation of the Building Code of the Virgin Islands was a proximate cause of the plaintiff's accident and injury. Indeed, the only evidence on the subject strongly suggests that Flamboyant's violation in no way caused the accident in question.
 
 
 26
 C. The Jury Instruction on Violation of the Licensing Statute
 
 
 27
 The evidence relevant to the trial court's instructions in the question of architectural licensing was provided on the testimony of Laurel Grigg, the recording secretary of the Board of Architects, Engineers and Land Surveyors of the Department of Public Works of the Virgin Islands. Mrs. Grigg testified that there was no record that William W. Bond was ever licensed temporarily or permanently with her office. Appendix at 328-329. However, Mrs. Grigg testified that Vincent A. Degutis obtained a temporary license to work on the project and that the Board's file indicated that Mr. Degutis was employed by W. W. Bond. Mrs. Grigg also testified that Mr. Degutis had advised the Board in August of 1971 that he was no longer associated with W.W. Bond, but that he would complete the project. Appendix at 331-332.
 
 
 28
 Mrs. Grigg also testified that Degutis had initially applied for his temporary permit on September 1, 1970, and had written to Mrs. Grigg's office on December 11, 1970 requesting that the permit be expedited so that the plans could be submitted. His written request for the expedited permit was on W. W. Bond stationery. Appendix at 336. William Bond, Jr. testified that he was a licensed architect and that his firm had designed 200 to 300 Holiday Inns. He also said his seal was not used in the Virgin Islands and that Degutis was associated with his firm and handled this project. Appendix at 532-533.
 
 
 29
 Based on this evidence, the trial court charged that if the jury believed that certain laws or rules of the Virgin Islands had been violated by a particular defendant, or more than one of them, then such act or failure to act in violation of the law was presumed negligence. The trial court charged the jury that it must find that any such violation was a proximate cause of the accident or damages in order to be relevant to the issues in the case. Appendix at 659-660.
 
 
 30
 In its charge, the trial judge analyzed extensively the statute dealing with licensing of architects in the Virgin Islands. See 27 V.I.C. § 281 et seq. The court charged the jury regarding the definition and qualifications of a professional architect and the nature of the practice of architecture. Appendix at 663-664.
 
 
 31
 27 V.I.C. § 281 provides in part that "any person practicing or offering to practice architecture ... shall hereafter be required to submit evidence that he is qualified so to practice and shall be licensed as hereinafter provided." It is clear on this record that there was no evidence that Flamboyant or any of its employees ever practiced or offered to practice architecture in the Virgin Islands. Nor is there any evidence that Holiday Inns was involved at the time in question with the design of the motel. Atlas did not become involved with the project until July 22, 1974, when it leased the completed motel from Flamboyant. Appendix at 750 et seq. Therefore, the entire Chapter 27 charge had no application to any of the defendants. It is clear that none of the defendants or their employees was required to secure a license as an architect in the Virgin Islands. Therefore the court's charge to the jury concerning the qualifications for licensing was misleading and confusing. It appears on the record that the Virgin Islands did qualify the architect who prepared the plans, and that any technical mistakes made by that architect in following the rules and regulations of the Virgin Islands would not be Flamboyant's responsibility.
 
 
 32
 The trial judge's instructions were confusing on other aspects of the licensing statute as well. For example, the court charged the jury on 27 V.I.C. § 286 dealing with the seal of architects. Subsection (b) of that statute states that each licensee shall obtain a seal and that plans and documents prepared by the licensee should be signed and stamped with the seal. However, Mrs. Grigg testified that temporary architects usually did not obtain a seal and submitted a copy of their permit with plans instead of a stamp and seal. Appendix at 330. In any event, Flamboyant, and the other defendants for that matter, had no duty or reason to obtain any seal, had no duty to be licensed to practice architecture in the Virgin Islands, and were not required to be so licensed. Furthermore, there is no evidence on this record that any of the defendants or their employees participated in any way in the signing and sealing of the plans submitted to the Department of Public Works. Thus, we rule that it was inaccurate, misleading and prejudicial to Flamboyant for the trial court to charge the jury that it could find that any of the defendants had violated these provisions of the Virgin Islands Code, that such violations were presumptively negligence, or that the jury could find they were a proximate cause of the accident.
 
 
 33
 For the foregoing reasons, the judgment of the district court will be reversed and remanded for a new trial consistent with this opinion.
 
 
 
 *
 Honorable Louis H. Pollak, United States District Judge for the Eastern District of Pennsylvania, sitting by designation
 
 
 [1]
 After the trial, the district court awarded plaintiff attorney's fees and costs
 
 
 [2]
 1 V.I.C. § 4 provides:
 The rules of the common law, as expressed in the Restatement of the law approved by the American Law Institute, and to the extent not so expressed, as generally understood and applied in the United States, shall be the rules of decision in the courts of the Virgin Islands in cases to which they apply, in the absence of local laws to the contrary.
 
 
 [3]
 Section 359 provides:
 Land Leased for Purpose Involving Admission of Public
 A lessor who leases land for a purpose which involves the admission of the public is subject to liability for physical harm caused to persons who enter the land for that purpose by a condition of the land existing when the lessee takes possession, if the lessor
 (a) knows or by the exercise of reasonable care could discover that the condition involves an unreasonable risk of harm to such persons, and
 (b) has reason to expect that the lessee will admit them before the land is put in safe condition for their reception, and
 (c) fails to exercise reasonable care to discover or to remedy the condition, or otherwise to protect such persons against it.
 
 
 [4]
 Section 356 provides:
 Conditions Existing When Lessor Transfers Possession: General Rule
 Except as stated in §§ 357-362, a lessor of land is not liable to his lessee or to others on the land for physical harm caused by any dangerous condition, whether natural or artificial, which existed when the lessee took possession.
 
 
 [5]
 The court had earlier in its charge defined proximate cause as being the "but for" rule of causation
 
 
 [6]
 Section 292 provides in part:
 General purposes, application, and scope
 (a) The purpose of this chapter is to safeguard life and limb, property, and public welfare, through the establishment of minimum building requirements for structural strength and stability.
 (b) Application.
 (1) General-The provisions of this chapter shall apply to the design, materials and methods, and to the construction, alteration, reconstruction, removal, and demolition of every structure located in the Virgin Islands;
 (2) New Buildings-All new buildings and/or structures constructed after the effective date of this chapter shall be required to conform with its provisions;
 (3) Existing Buildings-After the effective date of this chapter all existing buildings and/or structures enlarged, altered, or reconstructed, shall be so enlarged, altered, and reconstructed as to conform with the provisions of this chapter for new buildings, except as otherwise expressly provided for in this chapter.
 (c) Scope. This chapter does not cover all possible types of construction, design, materials and methods, and it is not the intent of this chapter to limit building to the types of construction design, materials and methods specifically covered herein. It is intended, basically, to assure that accepted engineering practice is employed in the execution of designs, that materials used are suitable for their intended use, and that good construction practices are followed. Therefore, for types of construction, design, materials, and methods not specifically covered in this chapter, it shall be generally necessary only to demonstrate compliance with the aforementioned principles. Nationally recognized codes and standards shall be used by the Commissioner as a basis for determining the acceptability of a design, material, or method not specifically covered in this chapter.
 
 
 [7]
 Section 294 provides in part:
 (a) Permits, requirements for exceptions.
 (1) After the effective date of this chapter, a permit issued by the Commissioner shall be required for the construction, reconstruction, structural alteration, enlargement, moving, conversion, or demolition of any building or structure, or appurtenances connected or attached to such buildings or structures.
 (2) Special building permits for a limited time must be obtained before the erection of temporary structures, including but not limited to, reviewing stands and booths. Such structures shall be completely removed upon the expiration of the period of time stated in the permit.
 (e) Plans. Plans are required to make possible the checking of the proposed work for structural soundness and stability as to accepted engineering practice and to ascertain compliance with other requirements of this chapter, and other applicable laws, rules and regulations.