**Nann I. ROBERTS, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**Civ. A. No. 80–0678.**

United States District Court, District of Columbia.

Feb. 25, 1981.

Norman H. Singer and Henry S. Stewart, Washington, D. C., for plaintiff.

Charles F. Flynn, Asst. U. S. Atty., Washington, D. C., for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

GASCH, District Judge.

This Federal Tort Claims Act case was tried before the Court on October 20, 1980. Following the trial the Court with counsel visited the scene of the accident. Pursuant to Rule 52(a), Federal Rules of Civil Procedure, the Court makes the following findings of fact and conclusions of law:

## FINDINGS OF FACT

1. Plaintiff is the wife of a retired civilian employee of the Department of the Army. As an incident of his employment, plaintiff's husband was eligible for membership in the Fort McNair Officers' Club. His membership in the Fort McNair Club entitled him to make use of the Bolling Air Force Base Officers' Club.

2. Plaintiff's husband accompanied by plaintiff and their son went to the Officers' Club at Bolling Air Force Base in the District of Columbia on October 10, 1977, to participate in a "Cook-Your-Own-Steak" dinner at a club room known as the "Pub" on the occasion of the son's birthday.

3. October 10, 1977, was Columbus Day, a holiday. The only dining room in operation on that day was the Pub, which was open from 11:00 a. m. until 10:30 p. m. The Pub is on the Upper Floor of the two-story building.

4. Sometime after 5:00 p. m. on the date in question, plaintiff's husband drove up to the South Entrance to the Lower Floor of the Club, and plaintiff and her son alighted from the car and entered the building. Plaintiff's husband proceeded to park the car.

5. Upon entering the South Entrance, plaintiff and her son found themselves in a lobby area.

6. Plaintiff had been to the Club about three times previously, but those visits were some years earlier, and she was not familiar with the building. She had, however, been given instructions by a friend to turn right upon entering the South Entrance, and follow a hallway toward the "Cook-Your-Own-Steak" location.

7. Instead, she turned left toward the Washington Room, which was closed and unlighted.

8. Plaintiff recalled having been in the Washington Room some years before, and wanted to see the room, and perhaps to show it to her son, while they waited for her husband to park the car.

9. Having turned left from the lobby, plaintiff walked into a reception area. Entering the reception area, she turned right and walked toward the north end of the reception area, which leads to the entrances of the Washington Room and the Maple Room.

10. Behind the plaintiff as she walked through the reception area toward the entrances to the Washington Room and the Maple Room was a window, facing South.

11. There was no artificial lighting in the reception area, and no artificial lighting in the two dining rooms toward which plaintiff was walking.

12. The Officers' Club makes an effort to conserve electricity and has a practice not to turn on unnecessary lights in unused areas of the Club, and so the reception area and the two unused dining rooms which it serves were darkened.

13. The management of the Club feels that the darkness of such unused areas of the Club is sufficient notice to visitors that they were not invited to enter those areas, although it was not the policy of the Club to exclude members from any part of the premises. In the words of the Club manager, "people should know" not to go into the dark recesses of darkened rooms.

14. Accordingly, when plaintiff walked from the lobby through the reception area, she was walking from a relatively bright area toward a dark area.

15. Following the conclusion of the trial, the Court visited the Officers' Club, and viewed the scene of plaintiff's fall, with the testimony of the witnesses fresh in mind, and aided by diagrams of the Upper and Lower Floors of the Club, which had been received in evidence by stipulation as plaintiff's Exhibit 4. Counsel for both parties were present.

16. Testimony at the trial established that the scene of plaintiff's fall as the Court viewed it on the trial date differed from the scene at the time of plaintiff's fall in the following respects:

(a) Wall hangings in the reception area may have been changed to some extent.

(b) Daylight illumination (from the South window of the reception area and the three South facing windows of the Washington Room) was considerably less at the time of plaintiff's fall. Plaintiff fell between 5:10 and 5:30 p. m. The Court visited the scene roughly two hours earlier than that, on a bright sunny day at about the same time of year, so the Court can conclude that the sun at the time of plaintiff's fall would have been two hours lower in the sky.

(c) Window shades on the three South-facing windows in the Maple Room and on the South-facing window in the reception area were always kept at "half-mast" at the time of plaintiff's fall. At the time of the Court's visit to the scene, one of the shades in the Washington Room was missing. The Court therefore concludes that this factor further decreased the amount of natural illumination in the Washington Room at the time of plaintiff's fall, and that the Washington Room was even darker at the time of plaintiff's fall than at the time of the Court's visit.

17. The plaintiff failed to appreciate as she walked from the South end of the reception area toward the stairs leading down to the Washington Room and the Maple Room, that she was walking into a gradually darker area. But she did acknowledge that when she reached the end of the reception area, she was standing on a very dark area of the floor. She was aware that the Washington Room was at a lower level than the floor on which she was standing for she testified that she looked down over the banister through the windows to see if the tables were set. She saw and held on to a banister and inched her feet along.

18. Her son testified that walking the same route that his mother walked he was able to see restaurant tables ahead in the dark, and was able to determine that those tables were on a lower level than the level of the reception area.

19. The Court finds from the testimony of the witnesses, as well as from its own observations that as the plaintiff walked from the South end of the reception area toward the stairs down to the Washington Room and Maple Room, she was walking through a dimly lit area into an almost completely dark area, and that if plaintiff had looked in the direction of the Maple Room, she would have seen either (a) nothing but darkness, or (b) a change in the floor level in the area ahead. In her testimony she indicated awareness of steps in the direction in which she was going.

20. At the dining room end of the reception area, one stairway leads down to the Washington Room and one leads down to the Maple Room. The stairway down to the Washington Room consists of about ten steps; to the right of that stairway is a flight of two steps leading down to the Maple Room. The two stairways are separated by a railing or banister.

21. Plaintiff stood at that railing with her hands on the railing, looking in the direction of the Washington Room, and was apparently unaware that she was standing at the head of the stairs to the Maple Room. There was no artificial light ahead. She heard no voices of persons talking or sounds from dishes.

22. Despite the fact that she was standing in almost complete darkness, plaintiff admitted that she took no precautionary measures for her own safety in moving toward the banister. She also admitted that she was aware that the area to her immediate right as she looked over the banister was dark, and that she had not sought to determine what lay in that direction. Still without any real concern for her safety, she stepped *sideways* to her right, with her attention directed completely toward the Washington Room, and fell down the stairs to the Maple Room.

23. Plaintiff believes that she was knocked temporarily unconscious. When she regained consciousness, she called to her son, who had not seen her fall.

24. Both of plaintiff's arms were broken as a result of the fall.

## CONCLUSIONS OF LAW

■ 1. At the outset, it should be noted that it is to be expected that there will be steps and changes in floor levels in public places. *See, e. g., Trinity Episcopal Church of Vero Beach v. Hoglund*, 222 So.2d 781, 783 (Fla. DCA 1969). Thus it should have been apparent to a reasonably prudent person in plaintiff's position that the dark area into which she had walked might lead to a staircase. In fact, while plaintiff herself said that she had paid no attention to what might lie in the direction of the darkness to her right just before she fell, her son testified that he was able to see restaurant tables some distance ahead in the dark area, and was able to determine that those tables were on a lower level than the level of the reception area. Plaintiff indicated some awareness of the steps and consequent change in floor levels.

2. In addition, it would be expected that a closed restaurant area might contain other possible obstructions such as chairs and tables.

■ 3. These factors only serve to emphasize the obvious fact that "darkness is, in itself, a warning to proceed either with extreme caution or not at all." *Bredder v. Liedenfrost*, 134 F.Supp. 487, 490 (M.D.Pa. 1955); *Trinity Episcopal Church of Vero Beach v. Hoglund, supra*, 222 So.2d at 783; *Hyde v. Blumenthal*, 136 Md. 445, 450, 110 Atl. 862, 864 (1920).

4. The leading case in this jurisdiction is *Smith v. Arbaugh's Restaurant, Inc.*, 469 F.2d 97 (D.C.Cir.1972), *cert. denied*, 412 U.S. 939, 93 S.Ct. 2774, 37 L.Ed.2d 399 (1973). This case did away with the common law distinction between "invitee" and "licensee" and established the rule that the duty of a landowner to a visitor on his property is to exercise "reasonable care under the circumstances."

... A landowner must act as a reasonable man in maintaining his property in a reasonably safe condition in view of all the circumstances, including the likelihood of injury to others, the seriousness

of the injury, and the burden of avoiding the risk.

*Id.* at 100. In order to determine whether a landowner has exercised reasonable care under all the circumstances,

[t]he factors to be weighed in the determination of the degree of care demanded in a specific situation are 'the likelihood that [the landowner's] conduct will injure others, taken with the seriousness of the injury if it happens, and balanced against the interest which [the landowner] must sacrifice to avoid the risk,' . . . .

*Id.* at 105–06. Foreseeability is a key factor:

. . . Foreseeability of the visitor's presence determines in part the likelihood of injury to him, and the extent of the interest which must be sacrificed to avoid the risk of injury.

*Id.* at 106.

5. It is noted that the plaintiff Smith in *Arbaugh's* was a District of Columbia health inspector who had been instructed by his superior to make an inspection of the barbecue pit in the basement of the adjacent property which could be reached only by going down greasy, slippery metal steps. Smith clearly had the obligation to descend these steps. Smith's obligation was clearly foreseeable insofar as Arbaugh's was concerned. Arbaugh's duty under the circumstances to exercise reasonable care to maintain the steps in a reasonably safe condition was evident. The trial court had relied upon its interpretation of *Firfer v. United States*, 93 U.S.App.D.C. 216, 219, 208 F.2d 524, 527 (1953).

■ 6. Applying these principles to the facts of this case we note that the Officers' Club was operating on a holiday schedule and that both the Washington Room and the Maple Room were closed. Neither room was lighted nor was the reception area leading to these rooms artificially lighted. There were no employees, maintenance workers or patrons of the club in these areas. Though plaintiff had been in the club before, she was not familiar with the area. She knew that the area where she was exploring was not the "Pub" where she was to have dinner. She knew that the Washington Room was down a flight of stairs and that all indications were that that room and that area was not open to patrons on this occasion. She nevertheless entered the darkened area not of necessity nor for the purpose of her visit but out of curiosity.

7. In the context of the *Arbaugh's* standards, plaintiff's presence in the area in question while not likely was perhaps "foreseeable". Extinguishing the lights in unused portions of the Club was not an adequate means of keeping all visitors from entering the darkened portions of those areas. Also in the context of the *Arbaugh's* standard of the interest which the landowner "must sacrifice to avoid the risk", it would be reasonable to expect defendant either to burn lights in areas not in use, or to erect warning signs or barricades to alert guests that the area was closed.[1]

8. Plaintiff suggests that the deliberate openness of the Club, as testified to by the managers of the Club, was construed as an invitation to her to wander throughout the Club, and could only have been revoked by the placing of barriers or signs of some sort. The Club managers felt that aesthetic considerations dictated against placing unsightly signs around the Club. The Club manager also thought that the extinguishment of lights was an adequate warning that the unlighted portion of the Club was not open to the public.

9. The Court concludes that the United States as the property owner owed a duty to plaintiff under the *Arbaugh's* standards, and negligently failed to discharge that duty to exercise ordinary care under all the circumstances. The question remains

---

1. But see Restatement (Second) of Torts § 359, Comment f (1965):

The lessor's liability is limited to those parts of the premises which, under the express or implied terms of the lease, are to be thrown open for the admission of the public. Thus the lessor has no liability under this Section to a customer in a leased restaurant who is injured when he wanders into the kitchen.

whether plaintiff was contributorily negligent[2] in entering the darkened area of the Club, and was thus barred from any recovery in this action. *See, e. g., Wingfield v. People's Drug Store, Inc.,* 379 A.2d 685 (D.C.App.1977).

Appellant next contends that the court should have charged that a "substantial degree" rather than "some degree" of contributory negligence was required on appellant's part in order for the jury to find that she could not recover for her injuries. The instruction given in the instant case was a correct statement of the law since the District of Columbia does not recognize different degrees of contributory negligence. The *rule is simply that contributory negligence bars a plaintiff's recovery. Karma Construction Co., Inc. v. King,* D.C.App., 296 A.2d 604, 605 (1972).

*Id.* at 687 (emphasis added).

10. Again we examine the conduct of the plaintiff, not only to determine, as above, whether the defendant should have foreseen her presence in the darkened area in question, but to determine whether the plaintiff herself exercised ordinary care and prudence for her own safety in the circumstances. We note that the plaintiff was moving in a nearly dark area of the floor, and that she saw at a distance that there were tables in the darkened area of the Maple Room, and that the tables were at a level lower than the level on which she stood. She knew there were steps ahead. She had encountered one barricade. Yet plaintiff testified that, while concentrating her attention not on the dark area in which she was, but on the Washington Room, she stepped *sideways* into the dark void, and fell down the stairs.

11. Proceeding in the dark under similar circumstances has been found to amount to contributory negligence as a matter of law, even where plaintiff was searching for a ladies' room in a public place, *Burgie v. Muench,* 65 Ohio App. 176, 29 N.E.2d 439 (1940); or was walking through a restaurant on a route which to some extent the defendant restauranteur had invited patrons to take, *Lyman v. Recreational Activities, Inc.,* 286 Minn. 308, 175 N.W.2d 498 (1970).

12. The fact that plaintiff in this case was merely wandering through the darkened portion of the Officers' Club not for the purpose for which she was invited weighs against her. Proceeding in the dark without a "compelling reason" or a "pressing emergency" has been held to amount to contributory negligence as a matter of law. *Brant v. Van Zandt,* 77 So.2d 858 (Fla.1955); *Polm v. Hession,* 363 Pa. 494, 70 A.2d 311, 312 (1950).

13. Plaintiff cites three federal cases in support of the proposition that the United States owes a duty of care to visitors to its premises. But these three cases are distinguishable on the facts. *Grant v. United States,* 271 F.2d 651 (2d Cir. 1959) involved a newsboy delivering papers in pre-dawn darkness who fell on dark stairs. He was found free of contributory negligence. He was on the steps on which he was invited to travel in the course of his employment. Plaintiff also cites *Salim v. United States,* 382 F.2d 240 (5th Cir. 1967). In this case a Post Office patron was transacting business and in leaving the Post Office fell on icy stairs. The trial court had found contributory negligence but the circuit court held there was no evidence of this and on the contrary concluded she was on the direct path from the post office door to the railing when she slipped on the ice. *Fournier v. United States,* 220 F.Supp. 752 (D.Miss. 1963), involved a club patron leaving by the front entrance who fell on unlighted dark stairs. She was found by the trial judge to be guilty of contributory negligence as she was intoxicated. In accordance with Mississippi law the recovery was reduced 50%. One guilty of contributory negligence in this district may not recover. *See Wingfield v. People's Drug Stores, Inc., supra.*

14. The only other "darkness" cases cited by plaintiff involve hidden hazards not analogous to the situation in the instant

---

**2.** See final sentence of footnote 48, *Smith v. Arbaugh's Restaurant, Inc., supra.*

case. *Gleason v. Academy of the Holy Cross*, 168 F.2d 561 (D.C.Cir.1948), involved an unexpected drop-off at the back of a dark platform, which was "latent and hidden", and which "reasonably careful people [were] not likely to discover." *Id.* at 562. In *Muldrow v. Daly*, 329 F.2d 886 (D.C.Cir. 1964), the property owner maintained an unguarded stairwell in an unlighted area adjacent to the public space. Mrs. Daly, still believing herself to be on the public alley, fell into the stairwell and was injured. *Id.* at 889.

15. Plaintiff did not have a "compelling reason" for walking toward the closed and darkened areas of the Officers' Club, nor was she reacting to a "pressing emergency". *Brant v. Van Zandt, supra; Polm v. Hession, supra.* Nor did she have to abandon any business obligation rather than travel in the darkness. *Grant v. United States, supra.* Nor was she a business invitee using the only route available to her. *Salim v. United States, supra; Fournier v. United States, supra.* The reason for plaintiff's entry into the darkened and closed areas of the Club must be described as curiosity rather than necessity. Under the circumstances, her failure to take proper precautions against being injured by proceeding in the dark without any concern for her own safety must be regarded as contributory negligence which was the proximate cause of her fall.

Defendant is therefore entitled to judgment. An appropriate order will be entered this date.